24-3608 and 25-2956, Northern Iowa, Weems Industries v. Teknor Apex Company All right, good morning. Mr. Miller, we'll hear from you first. You may proceed. Good morning, Your Honors. May it please the Court. Mr. Cady, Mr. Hardy, in these consolidated appeals, Weems Industries challenges the district court's cancellation of its trademark registration for the color chartreuse on the body of water hoses and the district court's award of approximately 3.2 million dollars in attorney's fees to Teknor Apex Company under the Lanham Act's exceptional case provision. Starting with the merits, the district court's cancellation of the trademark registration, the district court functionality and failure to function as a trademark. And starting with the merits, I want to first address the district court's functionality analysis. The district court concluded that Weems mark was functional because its high visibility feature affected the quality of its Flexzilla water hoses. But the district court applied an incorrect legal standard that lacks a limiting principle and invalidates color trademark registrations if the color serves any conceivable utilitarian function. Regardless of whether that function is meaningful or merely incidental to the use or purpose of the product at issue, here water hoses. As this court has stated and the Supreme Court, a feature is functional if it is essential to the use or purpose of the product at issue or if it affects its use, I'm sorry, or if it affects its cost or quality. Expounding on that standard, the Second Circuit in multiple cases has said that to affect the quality, the feature must improve the operation of the product at issue. Importantly, this court in Home Builders Association of St. Louis commented that, well, that tracks with that comment from this court's comment in that case where it had said that a function, just because it serves a utilitarian purpose, is not enough. There must be more. Like the Second Circuit said, the feature must improve the operation of the product at issue. The evidence presented at trial and the evidence credited by the district court illustrates this point well. Technor presented evidence at trial from a market research analyst, Mr. Brad Farnsworth, and his research showed two important things. First, that consumers in the water hose market primarily focus on things like performance features, including quality in particular, non- kinking, and durability. The other finding that Mr. Farnsworth made was that color, on the other hand, consistently ranked extremely low in importance to consumers in the water hose market. So the upshot of Mr. Farnsworth's market research analysis is that factors like quality and performance features, on one hand, rank really highly to consumers in the water hose market, where, on the other hand, color was not associated and, in fact, it was distinguished from quality and ranks extremely low in importance to consumers in the water hose market. The district court concluded that Wiem's mark was functional based on this insignificant and immaterial feature that, again, consumers in the water hose market consistently ranked as extremely unimportant. This court should correct the district court's legal standard to require that the feature on which it's going to base its functionality decision must constitute an improvement to the performance or operation of the product at issue, here, water hoses. Otherwise, the district court's conclusion is that an insignificant feature that ranks extremely low in importance makes the mark functional. Now, in its briefing, Technor argued, in opposition to this argument, that Wiem's lacked any legal support for this position. But that doesn't track with the cases cited in Wiem's briefing, both the Louboutin case and the Solzer case. In both of those cases, the court had concluded specifically the argument that Wiem's is making in this case, which is that the feature claimed to be functional must improve the operation of the product at issue. So, despite the argument in Technor's briefing, those cases and the legal authority do support the position that Wiem's takes in this case with respect to functionality. So, counsel, does it really come down to whether or not high visibility can make a hose functional? I believe it does, Your Honor, because that was the feature emphasized by the district court and the one that it found ultimately made the mark functional. And the importance, Your Honor, is that if you look at other cases, courts tend to do an analysis to determine whether that particular feature is, in fact, meaningful to the product. Here, the undisputed evidence and the record that the district court credited shows that color, including high visibility, ranked extremely low in the minds of water hose consumers. So, again, the district court is basing an important functionality and invalidity conclusion on evidence and things that consumers do not care about. The other argument that Technor made in response is that one of the cases from the Second Circuit that Wiem cited in support of its functionality argument, in fact, undercuts as opposed to supports Wiem's position. The color marks that were found to be functional in the Sulzer case from the Second Circuit are applied to dental tools and they served the court found a particular purpose of a color-coded shorthand among a comprehensive set of tools. In other words, a particular color signaled to the user when to use that particular tool and why. That same conclusion does not map on to the color at issue in this case because chartreuse is a singular color and the Flexzilla water hose is a singular product, not among a is useful. So, in fact, the Sulzer case illustrates the point that Wiem's is making in this case. I want to next pivot and discuss the district court's conclusion and analysis with respect to acquired distinctiveness. The district court's analysis suffers from multiple legal errors which this court has previously recognized in Lovelyskin. First, the district court's analysis of acquired distinctiveness was not narrowed down to the point in time that Wiem's acquired its registration. Second, the district court relied on legally insufficient evidence to find that Wiem's mark was lacking acquired distinctiveness. For context, Wiem's applied to register its chartreuse color mark on water hoses under Section 2F of the Lanham Act, which states that continuous and substantially exclusive use in commerce for five years is prima facie evidence of acquired distinctiveness. The district court, relying on those two elements, continuous and substantially exclusive use, cited some evidence to say that Wiem's mark lacked acquired distinctiveness. First, with respect to continuousness, the district court cited color changes in Wiem's mark. The last color change, however, in the record was in July of 2011 and is outside that five-year period of time that makes up a prima facie case of acquired distinctiveness. So that particular color change is not significant to acquired distinctiveness and certainly does not detract from the acquired distinctiveness that the trademark office found Wiem's had and certainly not by the time in 2017. What's also important about that particular color change, Your Honors, is that the district court never did an analysis to determine whether that color change was even perceptible to a consumer, let alone significant, because the cases, including those cited in Wiem's briefing, say that some variable tolerance is permissible. The color can change, it's just a matter of whether that change is significant. That analysis isn't completely absent from the district court's analysis. Moving to the issue of substantially exclusive use. The district court cited a large number of uses by third parties of color on their hoses, but the primary issue with the district court's reliance on this evidence is under Lovely Skin, in order for third-party use to be relevant to the acquired distinctiveness analysis, the use must be meaningful, and in order to be meaningful, the court must first understand the manner and extent of the third-party use. In the context of water hoses, we need to first understand are these colors the third-party uses even similar to the color of the market issue in this case, and also we have to understand when the hoses were sold, where they were sold, and the volumes or quantities in which they were sold. Without that information, the district court cannot know whether those third-party uses are meaningful as required by this court in Lovely Skin. If you go through some of the hoses that the district court cited to support this conclusion, it illustrates this point. For example, one of the very first hoses that the district court cited was Technor's very own Neverkink hose. According to the testimony at trial, that hose was pitched in 2005, released in 2006 onto the market, and shortly thereafter discontinued because it did not sell well. A hose that was released in 2006 and taken off the market shortly after that because it did not sell well is not meaningful to the acquired distinctiveness analysis with respect to Weemsmark because it does not speak to whether that third-party use was detracting from the acquired distinctiveness in Weemsmark. The other hoses that the district court went on to cite are also Technor Apex hoses. They include the Mainstays hose, and this is on page 53 of the district court's memorandum in order, the Kink Control Plus hose, the Room Essentials hose, and Technor's Medium Duty hose. At trial, there was no testimony elicited to establish any information about those hoses and whether their uses at all are meaningful and bear on the acquired distinctiveness analysis. In fact, it's striking how much information we are lacking on those hoses. There's one additional hose, Your Honors, the Healthy Habitat hose, which is again another Technor Apex hose, released in 2009, discontinued in 2013, again presumably because it did not sell well. If consumers are not being exposed to those particular hoses, then they do not detract from the acquired distinctiveness in Weemsmark. The district court did not do the analysis to require that the third-party uses of those hoses first be meaningful before they belong in the acquired distinctiveness analysis. In response to this particular argument, Technor said that the timing of when the district court analyzed acquired distinctiveness was a red herring. But that can't be right because the trademark office did determine that Weems had acquired distinctiveness as of September of 2017. So at a minimum, the district court had to consider whether Weems in fact had acquired distinctiveness as of that point in time and as the court in Lovelieskin had said, and the Federal Circuit in Converse had said, what's particularly important to determining acquired distinctiveness, and this maps on to the standard articulated by Section 2F of the Lanham Act, is the five-year period of time leading up to registration. The district court's analysis was quite nebulous and it's very difficult to understand at which point in time it was analyzing acquired distinctiveness. Now, Technor is right that acquired distinctiveness can be challenged at the time of trial. But again, we're lacking the information in the record to determine whether any third-party uses were relevant to acquired distinctiveness at any particular point in time. Additionally, the color change back in 2011 certainly does not speak to any acquired distinctiveness at the time of trial. If anything, it shows that the color has been constant since 2011 and would underscore and further support acquired distinctiveness, not detract from it. For these reasons, Your Honors, we believe that the district court both applied an incorrect legal standard and relied on legally insufficient evidence to conclude that acquired distinctiveness was lacking. I want to move now, Your Honors, to the attorney fee award by the The standard of review at this point is to consider whether the district court included in its analysis factors that it shouldn't have or included or failed to consider material factors that it should have considered. I apologize, Your Honor, can you repeat your question? Do you have any quarrel with the rates that the court used in determining the fees? Like the billable hour rates, Your Honor? I'm sorry? Yes. The rates? Do you have any disagreement with the rates? Not the rates per se, Your Honor, no. I didn't think so. That issue was litigated to the district court but is not raised on appeal. There was a passing mention of that but no argument about it, so I just wanted to make sure. That's right, Your Honor. That was litigated at the district court but is not a particular issue in this appeal. Thank you. I apologize. That's all right. What's important to note about the district court's attorney fee decision, Your Honors, is that it had bifurcated the issues of whether the case was in fact exceptional to begin with and then the amount. At the exceptional phase stage of the decision, the district court failed to consider a number of things that it should have considered because they're applicable to both parties in this case, particularly with respect to the functionality standard. The district court disliked the fact that Weems had focused its arguments too much on one part of the test as opposed to the other when in fact both parties had done that and throughout the merits briefing part of this case, Weems had criticized the legal standard that Technor was advancing, which is that if a feature has any bearing whatsoever on the use or purpose or quality of the product at issue, then it's functional, which does not track with the articulation of the standard from the U.S. Supreme Court nor this court in Pocket Plus. It also does not track with the standards articulated by the Second Circuit, which we'd advanced in this case, which is that in order to affect the quality, it has to improve the operation of the product. In fact, the district court did not consider Technor's own handling of the functionality standard and simply criticized Weems for its handling of the functionality standard when it should have considered both parties' conduct in that particular respect. One thing that I'm particularly interested in is why you think the amount of this fee is punitive. And I think this is another part of the same question, why deterrence is not a proper factor to consider in awarding fees. Your Honor, I believe that deterrence may be a proper factor to be considered, but I think as long as we're speaking toward the conduct before the United States Patent and Trademark Office that the district court had cited, I think what's particularly important there is that, number one, whether advertisements from 2009 were provided to the USPTO in connection with a 2016 application falls outside that five-year period defined by Section 2F of the Lanham Act. It's also not material because, as the District of Minnesota had commented in the 3M case with respect to the canary yellow color of its post-it notes, a party's subjective statements about the effect of a feature of its mark are less significant than whether the mark itself is truly functional. So those things are appropriate to be considered, Your Honor, but in this case they were given far too much weight and with respect to the rate, I'm sorry, the amount of the fees awarded, they should have at a minimum been cut off at the summary judgment stage of the case where the district court had said that there's no evidence to support the theory that certain documents were not provided to the USPTO and is therefore a fraudulent obtainment of the trademark registration in this case. That is something that the district court changed its mind on at trial and should therefore not be considered for purposes of the amount. I think there's a federal circuit case that holds that the amount of the fees have to be based on some consideration of compensation and not on some consideration of punishment or, it can't be punitive, but it must simply be compensatory. I mean, are you conceding that's wrong? No, Your Honor, that's our argument is that the award must be compensatory. I didn't hear you answer. That was my original question. I thought you said it was okay to consider deterrence. Well, deterrence can be considered to the extent that it speaks to compensation to another party, but the punitive nature of the award is an improper factor to be considered. All right, so why do you think this is punitive? That's what I'm wondering. Why is the district court straight away from the compensation principle in this instance? Because if you look at each of the exceptional circumstances cited by the district court, none of them can be tied back to a $3.2 million award in attorney's fees. The only thing that can conceivably be tied back to that would be this advertising material that was not provided to the USPTO in which the district court incorrectly said would have prevented this case in its entirety. I believe that's correct. I believe that's what the district court said. Yeah, which isn't... That was the thread, I think, in order. That was the line, the thread that it pulled to trace all of this amount to compensation, correct? That's right, Your Honor. At this time, I'm going to reserve the remainder of my time for rebuttal. Thank you. Very well. Mr. Hardy, we'll hear from you. May it please the court. Trademark infringement actions are inherently very factually intensive. This case was no exception. On the merits... You might just adjust the microphone so we can all hear you clearly. Sure. Please tell me if this is better. Yeah, I think so. So the trademark actions are highly fact-intensive. And as I said, this case was no exception. And on the merits issues, the court dealt primarily with issues of functionality, acquired distinctiveness. Those two are findings of fact. Not only are the ultimate determinations on functionality and lack of distinctiveness findings of fact, but so are the underlying factors that inform those, which the district court applied in this case. And important to step back and remember that this court had the case for four years, presided over summary judgment, a two-week bench trial, was there to judge the credibility of the witnesses, make important factual findings on these issues in which it did. The findings on functionality, much of which we did not hear from opposing counsel, informed the lower court's decision to a great degree. Those include that from the start, the court found that Weems wanted to and designed a hose that would have high visibility for safety and to prevent tripping accidents in the workplace. And then in 2009, the company went on an intentional and deliberate campaign to feature that functional aspect of the product in their advertising. Matthew Weems, the vice president of advertising, made sure that all included the phrase Flexzilla high-vis safety green makes hose more visible in the marketplace. And it wasn't just educating one group of people. It was distributors, retailers, end users. It involved changes to catalogs, flyers, right down the line. In the words of their own witness, this was extremely important that the sales reps and the market agencies continued to emphasize the Flexzilla color as high-vis safety green. And they even went so far as to go to trade shows and found those as opportunities for demonstrations of that high-vis color as they laid those hoses out across the floor. Then after spending a year touting the safety feature of its Flexzilla hoses to consumers and everyone in the industry, Weems made a complete 180 and tried to undo everything it had done in promoting that high-vis safety green feature of the hose. And for the sole reason, the court found, was what? To obtain a federal registration. After meeting with trademark counsel, the court found that Weems immediately sought to aggressively, and this is from their documents, scrub and sanitize. Scrub and sanitize any mention of the high-vis safety color green as it relates to the product. In fact, Mr. Matthew Weems, who was head of marketing and charged with this campaign, found it to be a high priority. When later testified that, well, it was simply a mistake to think that the color was high-vis and had this safety feature, the district court was there to judge the credibility. The district court determined that testimony was not credible. In fact, Mr. Weems went on later in trial to acknowledge that the scrubbing and sanitizing of the marketing materials for the high-vis safety feature was because the USPTO would otherwise cancel Weems' registration for the chartreuse color mark. Mark Weems, the president of the company, offered an excuse as to why the advertising was so strenuous in featuring this safety feature of the hose. It had to do with some OSHA standard and that color should not be used. Again, the district court was right there to assess the credibility, to assess the accuracy of that testimony. And what did the court say in its decision? That was concocted. A concocted story. It was not credible. And what did the district court ultimately found? That Weems made a conscious and deliberate decision to stop promoting the high-vis function because they knew it would be detrimental to their efforts to get the mark registered at the USPTO. Worse yet, the district court found in assessing the evidence presented at trial that Weems carried out a strategy of actually concealing evidence from the USPTO that would have resulted in the registration for this chartreuse color applied to the entire hose body would have resulted in that registration being denied. These are all obviously inconvenient facts for Weems in this case. But they bear directly on the issue of functionality and support the district court's judgment in that regard. Now, Weems argues in its appeal papers, and we heard today, that the standard that the operation must improve the operation. That was repeated several times. The problem is that is at odds with the formulation for functionality as the Supreme Court provided in Inwood. We know that, as the court talked there, it is not simply this very narrow, myopic view as to improving operation of the relevant good. But is that particular feature what? Is it essential to the use? Is it essential to the purpose? Or, in that second prong of the test, which the district court relied upon, does it affect the cost or quality of the goods? To now accept this test that, well, the feature must improve the operation of the good effectively rewrites the court standard. Here, the lower court was very clear in its decision to focus upon the Inwood formulation in terms of evaluating, you know, factors to evaluate to make a determination on functionality in view of the Supreme Court standard. The court looked to both Morton Norwich, also the Ninth Circuit's decision in Disc Golf, and found relevant factors there. Also looked to the Eighth Circuit, or a decision from the District of Minnesota, the Asics case, which was particularly persuasive in terms of how to make sense of and evaluate this evidence when you have the trademark owner touting the utilitarian advantages in advertising. I think the district court emphasized that point throughout the opinion and even in part of the opinion in which it awarded attorneys' fees. Isn't that correct? That's correct, Your Honor. The attorney's insistence on this proposition was simply wrong and caused a great deal of  That's exactly right, Your Honor. In fact, when the court talked about the exceptionality of this case, as Your Honor aptly pointed out, the lower court looked at, you know, the factors that relied upon to find this was stood out from the others, and whether these various factors that influence exceptionality, you know, to what extent did they exist through the case, and concluded that, you know, but for the concealment of this advertising materials, knowing what the outcome would have been, this case wouldn't have been filed. And the parties in the court wouldn't have had to expend the resources that they did. The court did look at heavily, as I mentioned, the extensive advertising and promotion, and gave that what it considered to be great weight, based upon the facts presented here. And the district court summarized its findings as Williams knew the color of the hose was feature, they attempted to sanitize, and then they withheld the damning information from the USPTO in order to receive the registration. And again, the district court looked at that as but one factor, but appropriately gave it significant weight, saying that it weighs strongly in favor of finding a functionality. The court did look at other evidence concerning the utilitarian advantages, the testimony of Stephen Bleicher that we point to in our briefing, the color science, color theory expert protector talked about the attributes of high-vis, chartreuse color, and the ability for humans to perceive that, particularly in low light. And in fact, the expert for Weems agreed on several points, including the ability to perceive that color, and also the studies upon which Mr. Bleicher relied upon. So the court did not look solely upon advertising, that was a significant factor, but it looked at other factors as well that had formed its determination on functionality. That included some third-party patents, where the teachings in those third-party patents looked at, well, there are oftentimes instances where useful objects have a high-vis color, and it provides a functional feature. Was that dispositive? No, it was simply consistent with and further evidence that supported this ultimate determination on functionality. I'd like to turn, Your Honor, to the question of acquired distinctiveness. The law is clear that color marks are never inherently distinctive, and therefore, they are only entitled to protection assuming they're not functional upon a showing of secondary meaning or acquired distinctiveness. And a mark acquires distinctiveness in the minds of consumers when they come to associate that mark with a particular source for the product. The court, this court, has recognized that, two, this distinctiveness factor, and acquired distinctiveness in particular, is also a very fact-intensive inquiry. So what Williams does is engages in a piecemeal attack based upon various findings of fact made by the court. And as we heard this morning, argues that, well, first of all, the testimony and the evidence was not meaningful as to third-party use. Why is third-party use in a case like this important? It's important because when you have other competitors that are using the same or similar mark in the marketplace, consumers don't have the ability and aren't conditioned to be able to distinguish as to source. So third-party use is always highly relevant where it exists in terms of acquired distinctiveness. And we take issue with the characterization that there was no meaningful testimony or evidence provided on this point. For example, there was Techner itself had sold several shades of water hoses, yellow, green, yellow, green, since long before Williams introduced the Flexzilla hose. The court found that. The court particularly credited the testimony of Nassindi Chattel, the senior channel manager. She had been with the company for many, many years, knew the water hose industry, was able to testify about the various shades of water hoses that are actually on the store shelves, that are actually there where consumers encounter them at the point of purchase. And Ms. Chattel testified about how Techner itself had developed a bright yellow-green hose even before, in 2005, a few years before Williams launched its Flexzilla hoses. The district court found Ms. Chattel's testimony to be credible, both as to the use of yellow-green and yellow-green hoses widespread throughout the marketplace, also these various store shops where people would go out to regionally and nationally and look to see what was on the shelves. And the testimony that was there was that, yes, there was ubiquitous use of the same and very similar colors. And there were approximately 50 exemplars that were introduced into evidence and accepted of very similar yellow-yellow-green colors, at least 20 of which fit the definition of chartreuse that Williams had proposed in this case. And so to say that the evidence was not meaningful is simply wrong. Because it went beyond just simply holding up a hose, and here's when it was sold, to testimony about the conditions in the marketplace over a period of time. And that is what third-party use is about, and that's what informed the inquiry. Now, this notion that, well, we are to look only at the five years preceding the registration in assessing distinctiveness. It's true. This court in Lovely Skin made reference to a five-year period. But that is a misreading of the case to say that it is only those five years that are relevant in assessing descriptiveness. The court never limited its assessment in the cancellation matter to that time, and the court actually cites approvingly to precedent from the Trademark Trial and Appeal Board. And much of the focus here is on Section 2F of the Lanham Act. That's where this comes from. The application which resulted in the registration was filed under Section 2F. And Section 2F says that the director at the USPTO may, may accept five years of substantially continuous and exclusive use as evidence of acquired distinctiveness. May. But that's only a guideline. And even the examining attorney in this case, in response to that 2F allegation, said that's not sufficient here, particularly when we're dealing with a color mark. We need to look beyond that to more factors. And so it's completely appropriate in cases like this to go beyond those five years, for example, when weems change the color of its hose. Why is the change and the color shift from color A to B to C, why is that important? Because consumers aren't able to begin to associate that particular mark with a source when it's changing. And it also brings into play those five years, of course, the touting of the functional advantages of the high-vis safety feature. And during that time, in that campaign of advertising the high-vis safety feature, weems was not directing the consumer's attention to the color. And so, again, more reason not to be tied to this five-year period. Weems argues that while the district court required exclusive use, as opposed to substantially exclusive use to show acquired distinctiveness, we would submit that's just a parsing of the court's decision from the Sturgis case. Yes, the court is to consider the length and exclusivity and manner in which the mark is used, and that's what the court did. And what the court ultimately concluded in looking at the third-party use before, during, and after weems' adoption of their chartreuse color mark concluded that Techner had made a showing to an extreme degree. Those are the court's words. Those are findings of fact now that are subject to a very highly deferential standard of review. In the attorney's fees, what's your view on this question, whether deterrence is a proper factor and whether the district court relied on it? Your Honor, deterrence is a proper factor. So you disagree with this Federal Circuit opinion that Judge Arnold mentioned? I think there's a distinction between an award being punitive and an award acting as a way of deterring future conduct. But I don't think it matters to this case, Your Honor, because the court, yes, did not find as a rationale and a basis for why it imposed the fees that it did that deterrence was the driving factor. More appropriately, it was because this case never would have been filed but for what the court found of the withholding, the concealment of evidence from the USPTO, which directly resulted in allowance of that registration. The court found, again, the finding of fact that weems knew that. Weems also knew that should any of those, as Matthew Weems acknowledged in his testimony, should any competitor bring to the USPTO a piece of that advertising, they would lose their rights. Counsel, what about a causal nexus between the alleged misconduct and the fees awarded? If we're dealing here with the question of whether it's an exceptional case, why shouldn't attorney fees be limited to misconduct rather than fees for everything? Because the court here looked at the totality of the circumstances, and the totality of the circumstances went back to day one, which was the filing of the application that matured into a registration where Weems engaged in concealment in order to obtain this registration and then continued on through trial. The court found that there was misconduct on the part of Weems at trial, and it wasn't just in its overuse of objections to exhibits but also found in its decision in support of exceptionality that the two principal officers for Weems who testified their testimony in court were at fault on several important issues to the case. And then finally, the court looked to the continued misapplication by Weems of the functionality standard. Yes, they were able to recite it, but they continued to only focus on the first prong, which is what we heard today, use operation. May I ask one more question? You may. Does the appropriateness of the attorney fee award depend on the court agreeing with you on all of your counterclaims? No. Well, what if we agreed on one that was dispositive but disagreed on others that were not dispositive? No, it does not, Your Honor, because a finding that upholds either the functionality or lack of distinctiveness, the same rationale was going to apply from the district court in terms of the reasons for awarding fees and why this case was considered exceptional. And again, it was the totality of the circumstances. So to take one counterclaim here or there and say that should be discounted, the counterclaims that drove the ultimate merits of this case were all decided very much in our client's favor. So we'd ask that this court uphold the merits judgment and also uphold the judgment of exceptionality and award of attorney's fees. Thank you. Okay. Thank you for your argument. Mr. Miller, you didn't have much time left. We'll move it to one minute and ask you to keep it to that, but you may proceed. Of course, Your Honor. Judge Arnold, to your question, compensation is certainly, under the U.S. Supreme Court precedent and Federal Circuit precedents that we'd cited in our briefing, it is the hallmark of attorney fee awards under the exceptional case provision in the Lanham Act. So compensation is the guiding principle. It is, in fact, the limiting principle. Here's what's most important about that. Technor did not move for summary judgment on either functionality or acquired distinctiveness. And as the Federal Circuit has said, it belies their position after trial to say that this case was exceptional from the start when they did not move for summary judgment on those issues. What's also important to keep in mind, Your Honors, is that the district court changed its view of Weems' position on functionality and acquired distinctiveness. materials to the trademark office between summary judgment and trial. Thank you, Your Honors. Before you sit down, what's the relevance of filing a motion for summary judgment to whether the case is exceptional? Is the implication that if it were a weak case, it would have gone out on a motion? Is that the point? It is, Your Honor. As the cases that we do... Suppose you have a factual dispute that requires a trial and the judge says, well, the witnesses creating the factual dispute are giving false testimony. Wouldn't that possibly qualify as exceptional even though a motion for summary judgment would not have been well taken? It could, Your Honor, because it is certainly circumstantial. But here in this case, it's very difficult for Technor to take the position that the high visibility feature, which was readily apparent, did not require any witness testimony or anything like that at trial. It belies their position after trial to say that we were exceptionally weak on functionality when they did not move for summary judgment on that issue. And I'll say that the district court also commented that Weems litigating positions with respect to functionality and acquired distinctiveness were not enough to make this case exceptional on its own. Thank you, Your Honors. Very well. Thank you for your argument. Thank you to both counsel, all counsel. The case is submitted and the court will file a decision in due course.